UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JERRI LYNN SERRA, individually
And on behalf of others similarly situated,

       Plaintiff,                            Case No.:  8:18-cv-2682-VMC-AAS

v.

SHRINERS HOSPITALS FOR CHILDREN, INC.,

       Defendant.

_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Fed. R. Civ. P. 56, Defendant Shriners Hospitals for Children, Inc.,

("Shriners Hospitals") moves for summary judgment on Plaintiff's Complaint.  (Doc. 1-1.)  The

grounds for the motion are set forth in the following incorporated memorandum of law and

statement of undisputed material facts, taken as true only for this motion.

## I.    STATEMENT OF MATERIAL FACTS[1]

### A.    Shriners Hospitals' Real Estate Marketing Division.

1.    Shriners Hospitals is a charity that owns and operates 22 hospitals that provide

children medical care regardless of ability to pay.  (*See, e.g.,* Pegler Dep. at 6:17-19.)

2.    A key part of Shriners Hospitals' operational funding comes from donated or

bequeathed property, including real estate.  (Serra Dep. at 19:21-20:22 ("Q. . . . Is [real estate] a

big part of what Shriners uses to operate?  A. . . . [R]eal estate was a key asset in bringing in

---

[1] The undisputed evidence presented is based on the January 18, 2019 Deposition and February 13, 2019 Continued Deposition of Jerri Lynn Serra (collectively, "Serra Dep."); January 31, 2019 Deposition of Robert S. Marr, Jr. ("Marr Dep."); January 31, 2019 Deposition of Sharon Lynn Russell ("Russell Dep."); January 30, 2019 Deposition of Gary Foster ("Foster Dep."); and January 30, 2019, Deposition of Jeffrey Pegler ("Pegler Dep.") (all attached, in full and with exhibits, as <u>Exhibits A through F</u>).

actual monies for the organization. . . . It was **the** key.  It still is.  It's key.  Q.  A key asset?  A. Yes, it is.") (emphasis added).)

3.      The money raised from real estate property sales is essential to Shriners Hospitals' mission of providing no-cost medical care to children.  (Serra Dep. at 19:21-20:3 ("[P]eople when they pass away, they bequeath or we get donated property and then they leave the property to Shriners. . . then. . . we place the property on the market to sell, and the money generated from that goes to run our 22 hospitals.").)

4.      Sale of real estate is a substantial portion of Shriners Hospitals' overall revenues: for example, in one year, the Real Estate Marketing Department's real estate sales accounted for approximately $100 million dollars, or 10% of Shriners Hospitals' overall annual profit.  (Foster Dep. at 8:22-9:12.)

**B.      Plaintiff Serra.**

5.      Serra first became employed by Shriners Hospitals as a receptionist in 1984 and progressed into various positions over time.  (Serra Dep. at 10:1-3; *see also* Compl. at ¶ 8.)

6.      Serra obtained both her B.A. in business and Florida real estate license while working for Shriners Hospitals.  (Serra Dep. at 16:19-17:8.)

7.      Serra's direct supervisor was Gary Foster, Real Estate Marketing Manager. (Serra Dep. at 44:7-19; Foster Dep. 6:23-7-7, 13:3-7.)

8.      During the three years prior to the filing of the Complaint, Serra held only two job titles:  (1) Real Estate Marketing Closing Process Manager (from May 2018 until her termination); and (2) Assistant Real Estate Marketing Manager/Closing Coordinator (prior to May 2018).  (Serra Dep. at 37:23-38-7, 43:5-12.)

9.      Despite two different job titles, Serra testified that she performed the same job

duties during this three-year period.  (Serra Dep. at 129:3-17, 260:25-261:3.)

10.     During the relevant period, Serra earned a salary well in excess of $455/week—Serra estimates her salary was $57,000 annually.  (Serra Dep. at 106:3-4, 106:21-107:5.)

**C.     Serra's Job Responsibilities at Shriners.**

11.     As both the Real Estate Marketing and Closing Process Manager and Assistant Real Estate Marketing Manager/Closing Coordinator, Plaintiff's "primary job" was to manage real properties from "listing to the closing." (Serra Dep. at 139:5-140:1, 84:5-85:2 ("Q.  What else are you qualified to do in terms of real estate, based on having done this prior job for the last three years at Shriners?  A. Well, that's my *primary job* is from the – *is manage the listing to the closing.  You know, getting the property ready to go on the market.*) (emphasis added).)

12.     At the time of her departure, Serra was responsible for over 200 properties—which included properties in the due diligence stage, properties listed, properties under contract, and certain "junk properties" which have lower value.   (Serra Dep. at 21:8-20, 65:25-66:3.)

13.     Serra's properties included high value properties worth over a million dollars. (Serra Dep. at 277:23-278:10.)

14.     Serra acknowledged that "[e]ach property is different" depending on the specific situation and each property's complexity.  (Serra Dep. at 271:24-272:1.)

15.     Because the purpose of Serra's job was to maximize the sale of real property to support Shriners Hospitals' charitable operations, sometimes that meant investing a lot in repairs to maximize sales price and, at other times, Serra tried to lower operating costs on the property for a quicker sale.  (Serra Dep. 173:21-174:1 ("*[F]rom due diligence to the closing,* you know, we have the property, so we want to find out what kind of property it is, what the problems are, *how can we make the most money for the organization.*") (emphasis added).)

16.     To carry out her job, Serra performed the following duties (among others): listing properties; working with brokers; tracking and updating the listings; "communicating with the brokers and getting the contracts"; assisting in negotiations; obtaining and reviewing contracts; appraising properties; performing due diligence; contacting the title company; commencing the closing stage; obtaining closing documents and making necessary changes; reviewing the title report; marking anything that legal will need to review;[2] getting the file ready for audit; assisting in determining the proposed marketing recommendations for properties; conducting research and analysis; and communicating with various professionals in the field.  (Serra Dep. at 49:10-15, 84:5-85:2, 55:2-7, 181:15-23; Marr Dep. at 71:9-14.)

### 1.     Authority to Select and Manage Third-Party Brokers, Contractors, and Vendors.

17.     Serra had the authority to choose which brokers assisted in the appraisal of Shriners' properties—including conducting online market research, obtaining multiple estimates, and reviewing potential brokers' biographies.  (Serra Dep. at 65:16-24; Russell Dep. at 66:12-24 ("Q.  What kind of recommendations would [Serra] make?  A.  Recommendations on vendors, recommendations on title company, recommendations on brokers, recommendations on payment"); Foster Dep. at 54:23-55:1 ("A. . . . [Serra] was capable of hiring and engaging real estate brokers, vendors, lawn guys, repairmen.  She was authorized to engage them.").)

18.     Although Serra testified she sometimes compiled a list of potential brokers for review by her supervisor, Foster, she admitted that she selected the "majority" of brokers herself.

---

[2] It is undisputed that the Real Estate Department is not part of Shriners' legal department and it performs entirely different functions than the legal department. *See* Serra Dep. at 52:13-53:5.  The legal department reviews certain documents solely for legal compliance, it is not involved in the business decisions regarding the sale of real estate. *See* Serra Dep. at 189:21-4 ("Q. . . . All of the things that you know that you put into this contract, that has nothing to do with [corporate counsel] Jeff Pegler.  He's just reviewing it for legal compliance.  Is that right?  A. Right."); *see also id.* at 189:21-4 (affirming that the legal department has no authority to reject a real estate offer); Pegler Dep. at 7:2-22, 12:8-12, 13:6-8, 18:4-8, 44:21-45:1 (testifying he did not direct Serra's work, was not her manager, did not review documents she created, and had his own certified paralegal).

(Serra Dep. at 34:8-20, 65:7-24.)[3]

19.     Serra also had the authority to fire poor performing brokers and retain better performing ones. (*See, e.g.,* Serra Dep. at 144:10-14) ("Q.  So you had authority to say if a broker was not responding to you fast enough, that you were going to look for another broker on behalf of the organization?  A. Yes.").)

20.     Along with brokers, Serra had the authority to (and did) select vendors and contractors to work on properties, such as removing personal items from and cleaning the property, by independently searching the internet, reading reviews and vendor biographies, and analyzing their credentials and resumes and manage their performance.[4]

21.     For example, Serra obtained estimates from contractors to improve or repair the properties—including, painting, repairing, and performing lawn maintenance on the properties. (Serra Dep. at 35:17-36:2; Foster Dep. at 54:23-55:1.)

22.     In addition to selecting vendors, Serra "instruct[ed] them what to do and how to perform their task."  (Foster Dep. 55:16-19.)

23.     Serra had the authority to fire vendors, and find other vendors who were able to perform the required tasks without obtaining prior approval.  (Serra Dep. at 166:6-14.)

**2.     Other Discretionary Job Duties Impacting Shriners' Business.**

24.     Serra exercised discretion when interacting with real estate brokers and other third parties in order to maximize Shriners Hospitals' profits—including, for example, managing a

---

[3] *See id.* ("A. If we're looking for an appraisal, we have to get an appraisal of the property because we have to establish a value for the property, so we get three estimates and their bios, and then I provide that information to the real estate marketing manager and he'll select.  Q. So you don't select?  You just gather all the information, but you don't select any of the vendors.  A. *I select the majority of the brokers.*"); *see also id.* at 35:9-11 ("You select the majority of real estate brokers.  Is that right?  A. Right."); *id.* at 65:7-24.
[4] *See* Serra Dep. at 33:10-25; *see also* Russell at 69:5-11 ("Q. Did she deal with contractors?  A. Yes.  Q. What was her role with dealing with contractors?  A. She would find contractors for specific actions that we needed taken at any of our properties.  She would work with them to make sure that the work was done.  She would check on the status with them.").

property in San Diego that was appraised at $905,000.  (Foster Dep. at 91:9-92:20.)

25.     Serra worked with nine vendors to perform selective repair and improvement on the property, which resulted in Shriners being able to sell the San Diego property for $1,125,000. (Foster Dep. at 92:4-6.)

26.     Specifically, Serra "*made the decisions on what repair and improvement would most logically contribute to the resale value of the house*"—including redoing the driveway, redoing the exterior of the house, taking down fences, addressing code violations for a porch without handrails, and removing asbestos in the walls.  (Foster Dep. at 92:10-20 (emphasis added).)

27.     Serra solicited proposals from all of the contractors, and made recommendations to Foster to accept certain bids.  (Foster Dep. at 92:10-93:11.)

28.     With respect to the San Diego property, Foster testified that "had it not been for Lynn's involvement with working with those vendors, *we would not have hit the targeted sales price on the property* [of a million dollars]."  (Foster Dep. at 92:6-9 (emphasis added).)

29.     In another instance, instead of spending money on repairing a property, Serra obtained a reduction of $360,000 in the property's assessed property value which reduced Shriner's tax liability by 60%.  (Serra Dep. at 134:4-135:4, Exh. 4; Russell Dep. 4:15-17.)[5]

30.     Serra was authorized to issue payments for invoices of $500 or less without approval—such as approving tax payments and vendor payments.  (*See, e.g.,* Serra Dep. at 268:1-4; Russell Dep. at 87:1-3.)

31.     This $500 limit was not cumulative, but rather, per invoice, in other words, Serra was authorized to approve these payments on a *reoccurring* basis (*i.e.,* a weekly basis) resulting

---

[5] *See also* Russell Dep. 68:3-17 (stating, for another property, Serra lowered the property's taxes by $60,000 to $100,000 based on her own initiative).

in authority to approve invoices in the thousands per property (and she had over 200 properties). (Russell Dep. 88:5-89:1 ("Q. . . . So if she has a remediation person cleaning the property and every week it's $450, for a year[,] she could approve that? . . .  A. Technically, yes.").)

32.     Indeed, although others may be required to sign a check as a "procedural" matter,[6] Serra engaged third-party vendors and received approval *after* Serra hired the vendors and the work was complete.  (Foster Dep. at 55:11-15 ("A. . . . I authorized Lynn to engage vendors to sums *in excess of $17,000*.  The sign-off on the check was a procedural matter, but the decision to engage them, hire them and have them perform work had already been done.  *The approval of the check was after the fact*.") (emphasis added).)

33.     Serra performed compliance audits of files to ensure Shriners was conducting its business ethically, and Serra's audits were not reviewed by her supervisor or the legal team. (Serra Dep. at 86:24-87:19.)

34.     Serra addressed environmental issues on the properties, such as dealing with buried gas tanks or asbestos issues.[7]

35.     For example, in assessing the environmental work needed for a property to be rezoned, Serra relied upon a professional engineer to determine "possible options of what could be done and the cost of environmental work to get the property rezoned."  (Serra Dep. at 171:7-170:9.)

---

[6] Although some contracts above a certain amount had to be signed off on by another employee, every employee at Shriners—including high ranking executives such as Russell—have limits on their spending ability due to the non-profit nature of the business.  *See* Russell Dep. 13:21-23, 84:9-85:8, 87:1-23 ("Q.  Is there some reason why the spending authority for Shriners organization is limited in this way?  A.  To ensure we're being good stewards of our funds."); Foster Dep. 34:6-11 ("The process of getting approval to perform a real estate action, a sale of real property, was more of a policy relative to our audit procedures.").

[7] *See* Russell Dep. at 69:13-70:3 ("Q.  Was any part of her job addressing environmental issues on properties?  A. Yes.  Q.  What was that about?  A.  There were certain of our properties, especially older ones, might have – on has, like, a gas tank buried in it.  There could be asbestos in an older building. . . . Q.  Would you be able to tell Lynn Serra what to do about asbestos?  A.  No."); Foster Dep. at 92:10-93:11.

36.     Nonetheless, Serra admitted that she and Foster analyzed options to maximize profitability of the property, stating (with respect to her *own* job duties):  "*I was thinking about how we might could get the most out of this property because the net sale proceeds of a sale goes to support our mission of helping children and their families.  I wanted find out how much cost we would have to absorb in pursuing a zoning change to C2 general commercial.  I am trying to determine if this would be feasible for or not for our organization if we were to attempt to do this.*" (*Id.* (emphasis added).)

37.     Serra communicated directly with municipalities and contacted vendors to address problems (including a notice of violation from the city).  (Serra Dep. at 166:22-167:6.)

38.     Serra held herself out as being a manager when dealing with the general public and other third parties—her letterhead and email signature listed her title as "manager" and it was Serra accepted and/or rejected offers on behalf of Shriners Hospitals.  (Serra Dep. at 138:24-139:4, 178:23-179:2, 180:21-181:23 ("A. . . . I convey if we accept, reject on behalf of the organization?  Q.  Do you know why?  A. . . . [I]t's part of my job. . . . [b]ecause I'm the one that's in constant communication with the broker, so I've developed a relationship with the broker.  So it probably makes sense to have me convey, you know, what we're going to do to the broker.  That's how I see it.").)[8]

### 3.     Plaintiff's Testimony Affirming the Importance and Discretionary Nature of Her Job.

39.     Serra testified that an individual without a college degree could not have successfully performed her job for the last three years.  (Serra Dep. at 94:13-17 ("Q.  Could

---

[8] *See also* Serra Dep. at 183:16-184:1 ("Q.  Well, what I'm saying is all the communications on behalf of the organization with regard to accepting prices, accepting offers, rejecting offers, hiring vendors, all of that, all those communications are under your signature?  A.  For the properties under real estate marketing management.  Q.  Yes. A.  Pretty much."); Foster Dep. at 41:11-25 ("A. . . . All correspondence with a listing broker came back to Lynn Serra.").

someone without a college degree do your job?  A.  Now I don't think so.  Q.  I'm talking about in the last three years?  A. No.").)

40.     Even though Serra reported to Foster, she admitted that she seldom performed clerical work (such as making calls or typing envelopes) for Foster;[9] instead, Serra testified that she spent the majority of time performing her own work.  (Serra Dep. at 72:13-19.)[10]

41.     Serra believed her job required "a significant level of experience with real estate marketing and due diligence," and stated it would take someone with a real estate background "years" to successfully perform her job.  (Serra Dep. at 94:12-95:5.)

42.     For example, Serra testified that an understanding of "real estate practice" was critical "[b]ecause that's what the job is about, *real estate, real properties, marketing, selling*." (Serra Dep. at 277:6-10 (emphasis added).)

43.     Serra testified that she should be paid more and her job should have "management" in the title due to the complexity and discretion needed for her job.  (*See* Serra Dep. at 195:10-196:12; *also* Serra Dep. at 48:6-19 ("Q.  [D]id you believe that your job had become *more complex* and had *more responsibilities* that it needed to have some kind of management in the title?  A. *Yes.*  Q.  And what you and Mr. Foster were talking to Bob Marr about was that your job was being undervalued, right?  A.  More or less, yes.  Q.  I mean, you and he were saying she has *a lot of responsibility, she has a lot of discretion,* she has a lot of – *her job is complex and it needs to be evaluated that way.*  Right?  A. *Right.*") (emphasis added).)

44.     For instance, Serra acknowledged she was dealing with high-valued properties

---

[9] Serra Dep. at 71:9-72:1 ("Q.  If [Foster] needed you to make a phone call, would you do it?  A.  Yes.  Q. Okay. *How often would that happen that he would you ask you to do something?* A.  *Not very often.*  Q.  In the three years in which you and Gary Foster worked together, where he was your supervisor, how many times did he ask you to type an envelope for him?  A. *Not even enough to mention really.*") (emphasis added).

[10] *Id.* ("Q. . . . But how often would it happen that he would ask you to do those kinds of routine clerical tasks?  A. It's hard to say.  Just whenever they came up.  I mean, *most of the time I'm reviewing contracts, listings, and closings.  I'm not like typing envelopes for him*.") (emphasis added).

that required more extensive "marketing due diligence" because they weren't straight-forward or "clear" properties.  (Serra Dep. 48:24-49:12.)

45.       In fact, Shriners Hospitals specifically instructed Serra to focus less on "junk properties" and more on "properties that had more significant value."  (Serra Dep. at 66:14-23, 277:23-278:10 (also stating she handled million dollar properties).)

46.       Due to the complexity of her projects during the last three years, Serra affirmed that she had to independently perform work—such as managing vendors, making repairs, hiring contractors, ensuring taxes were paid, and ensuring utilities were on—***before*** she was even able to refer the properties to her supervisor, Foster.  (Serra Dep. at 95:2-96:6, 55:13; *see also* Foster Dep. 54:24-55:15 (noting check approval was only *after* Serra already hired vendors and the work was performed).)[11]

47.       In carrying out her job, such as conducting due diligence on properties, Serra relied on her own knowledge and experience, and there was no "written checklist" that she could rely upon on a daily basis to perform her job.  (*See, e.g.,* Serra Dep. at 64:3-11.)

## II.       MEMORANDUM OF LAW

### A.       <u>Summary Judgment Standard in FLSA Exemption Cases.</u>

#### 1.       The U.S. Supreme Court Mandates Courts "Fairly Read" Exemptions Rather Than "Narrowly Construe" Them Against Employers.

In determining the applicability of FLSA exemptions (as in this case), the U.S. Supreme Court has recently mandated that exemptions be given a "***fair reading***" by the courts rather than

---

[11] *Id.* ("A. . . . These properties had so much work to be done ***before*** I could even give them to Gary.  Q.  When you say 'work,' you mean you have to hire a bunch of vendors because there's so much that needs – A.  Vendor management, yeah, you have to hire.  Made a lot of repairs.  Some properties they needed so many repairs before we could put it on the market, and that takes a lot of time.  You have to get contractors, have them go out there, and you have to wait until they're done and then, you know, make sure the taxes are paid, make sure the utilities are on, make sure it's clean inside, the lawn is done.") (emphasis added).

being "narrowly construed" against the employer.  *See Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (emphasis added).  Specifically, the Court stated "the FLSA gives no 'textual indication' that its exemptions should be construed narrowly;" and, therefore, "'there is no reason to give [them] anything other than a fair (rather than a 'narrow') interpretation.'"  *Id.* Therefore, following *Encino Motorcars*, courts may no longer rely on the narrow construction principle to deny an employee's exempt status.  *Id.*  Rather, courts must "give the exemption . . . a fair reading" under the law.  *Id.*

This standard is applicable at the summary judgment stage.  *See, e.g., Mosquera v. MTI Retreading Co.*, No. 17-2366, 2018 U.S. App. LEXIS 22462, at *6 (6th Cir. Aug. 14, 2018) (relying in *Encino's* "fair interpretation" standard and affirming the plaintiff was exempt under the FLSA's professional exemption); *Smith v. Ochsner Health Sys.*, No. 17-9899, 2018 U.S. Dist. LEXIS 193178, at *29 (E.D. La. Nov. 13, 2018) (granting summary judgment for the employer and holding, under the *Encino* standard, the employee qualified for the FLSA's highly-compensated exemption); *cf. Mobley v. Shoe Show, Inc.*, No. CV 2:17-024, 2018 U.S. Dist. LEXIS 173650, at *1 (S.D. Ga. Oct. 9, 2018) (denying employer's extraordinary request for reconsideration, but recognizing the applicability of the new *Encino* standard in the Eleventh Circuit and holding "*there may be FLSA exemption cases where the abrogation of the narrow construction principle changes the result*") (emphasis added).

## B.     Plaintiff Is Exempt from Overtime under the FLSA's Administrative Exemption.

The FLSA generally requires that employees be paid time-and-a-half their regular rate for all hours worked in excess of forty (40) hours during the course of a workweek.  *See* 29 U.S.C. § 207.  Nonetheless, "[t]he FLSA includes several exemptions from its . . . overtime requirements."  *Gregory v. First Title of Am., Inc.*, 555 F.3d 1300, 1302 (11th Cir. 2009).  For

instance, the FLSA expressly exempts from overtime coverage "any employee employed in a bona fide executive, *administrative* or professional capacity." *See Jarvis v. Griffin*, No. 6:08-cv-138-Orl-19KRS, 2009 U.S. Dist. LEXIS 86484, at *18 (M.D. Fla. Sep. 21, 2009) (Fawsett, J.) (emphasis added). **The FLSA's "exemptions are as much a part of the FLSA's purpose as the overtime-pay requirement."** *See Encino Motorcars, LLC*, 138 S. Ct. at 1142.

Under the FLSA's administrative exemption, an employee qualifies for the exemption and, therefore, is not entitled to receive overtime wages, where the employee:

(1)     is compensated on a salary basis of not less than $ 455 per week;

(2)     primarily performs office or non-manual work directly related to the management or general business operations of the employer or employer's customers; and

(3)     exercises discretion and independent judgment with respect to matters of significance.

*See Jarvis*, 2009 U.S. Dist. LEXIS 86484, at *20 (citing 29 C.F.R. § 541.200(a)); U.S. Dept. of Labor Fact Sheet #17C, *available at* http://www.dol.gov/whd/overtime/fs17c_administrative.pdf (last visited Feb. 25, 2019) (hereinafter, "DOL Fact Sheet #17C").

Serra earned a salary in excess of $455/week during the entire relevant period and performed job duties that satisfy the administrative exemption. Therefore, the Court should grant summary judgment in favor of Defendant.

### 1.     At All Relevant Times, Plaintiff Was Paid a Salary In Excess of $455/Week.

The first prong of the three-part test for the administrative exemption is referred to as the "salary basis test." *Jarvis,* 2009 U.S. Dist. LEXIS 86484, at *20-21. An employee will be considered to be paid on a "salary basis" within the meaning of FLSA "if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction

12

because of variations in the quality or quantity of the work performed." *See* 29 C.F.R. § 541.602(a).  The current salary threshold is $455/week.  *See Garcia v. ALS Educ., Inc.*, No. 16-cv-22037-KMW, 2017 U.S. Dist. LEXIS 115060, at *23 (S.D. Fla. July 21, 2017); *see also* DOL Fact Sheet #17C.   There is no dispute that Plaintiff was paid on a salary basis in excess of $455/week during the entire relevant period.  At all times from October 9, 2015 (*i.e.,* three years prior to the filing of the Complaint) until her departure, Plaintiff admits that she earned an annual salary of approximately $57,000.  (Serra Dep. at 106:3-4, 106:21-107:5.)  This salary is the equivalent of over $1,000 per week—*i.e.,* more than double the $455/week salary threshold for the administrative exemption.  (*Id.*)  Therefore, Plaintiff satisfies the FLSA's salary basis test.

2. **Plaintiff's Primary Job Duty Was the Performance of Office or Non-Manual Work Directly Related to Defendant's General Business Operations.**

The second prong of the FLSA's administrative exemption requires that "an employee's 'primary duty' must be the performance of exempt work."  29 C.F.R. § 541.700(a).  The term "primary duty" means "the principal, main, major or most important duty that the employee performs."  *Id.*  "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job *as a whole*."  *Id.* (emphasis added). When determining the primary duty of an employee, courts should consider: (1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.  *Id.*

Additionally, the FLSA's implementing regulations provide numerous categories of work which are considered "directly related to management or general business operations."  29 C.F.R. § 541.201(b).  These categories include, but are not limited to:

> tax; *finance*; accounting; *budgeting*; auditing; insurance; quality control; *purchasing*; *procurement*; advertising; marketing; *research*; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; *legal and regulatory compliance*; and similar activities.

*Id.* (emphasis added).

Here, at all relevant times, Plaintiff's self-described "primary job" (and most important duty) was the management and sale of willed and/or bequeathed properties for Shriners Hospitals.  (Serra Dep. at 84:5-85:2 ("Well, that's my *primary job* is from the – *is manage the listing to the closing.  You know, getting the property ready to go on the market.*) (emphasis added).)  At the time of her departure, Serra managed over 200 properties—including properties valued at over one million dollars.  (*Id.* at 21:8-20, 65:25-66:3, 277:23-278:10.)  Funds derived from the sale of real properties constituted 10% of Shriners Hospitals' annual profits and are directly related to Defendant's general business operations of providing free medical care to children.  (Foster Dep.at 8:22-9:12; Serra Dep. at 19:21-20:3 ("[W]e place the property on the market to sell, *and the money generated from that goes to run our 22 hospitals*.") (emphasis added).).  Importantly, Plaintiff admits the overarching purpose of *her own job* was to help ensure Shriners maximized the value of properties it received so Shriners could continue its operations. (Serra Dep. 19:21-20:3; 171:7-170:9, 173:1-174:1.)

In carrying out these duties, Plaintiff job required that she perform functions related to finance, budgeting, purchasing and procurement, research, and legal and regulatory compliance.

*See* 29 C.F.R. § 541.201(b).[12]  For example, Plaintiff procured services directly from vendors, contractors, and other third parties—including, purchasing repair, environmental assessment, and maintenance work.[13]  As part of the procurement process, Plaintiff solicited proposals from contractors, and made recommendations to Foster to accept certain bids.  (Foster Dep. at 92:10-93:11.)  Indeed, Plaintiff had to conduct a cost/benefit analysis for these services since she "made the decisions on what repair and improvement would *most logically contribute to the resale value . . . .*"  (*Id.* at 91:9-92:20 (emphasis added).)  Similarly, in order to appraise properties, Plaintiff selected brokers after conducting market research, researching the brokers, reviewing their biographies, and procuring multiple estimates.  (Serra Dep. at 34:8-20, 65:7-24, 156:17-19; Foster Dep. at 54:23-55:1.)

Plaintiff's authority was not limited to selecting brokers, vendors, and other third-parties; but rather, she **"instruct[ed] them what to do and how to perform their task"** and **was independently authorized to fire vendors and brokers who were not performing well** (as well as replacing them).  (Foster Dep. 55:16-19; Serra Dep. at 144:10-14, 166:6-14.)  Plaintiff also performed legal compliance duties—such as **performing "marketing due diligence" on properties; addressing environmental issues (including dealing with buried gas tanks, asbestos, and/or rezoning issues); communicating with municipalities; and verifying property taxes were paid and up to date.**  (Serra Dep. at 48:24-49:12, 55:13, 95:2-96:6, 166:22-167:6, 171:7-170:9; Russell Dep. at 69:13-70:3; Foster Dep. at 92:10-93:11.)  Additionally, Serra **performed compliance audits of files** to ensure Shriners was conducting its business ethically.  (Serra Dep. at 86:24-87:19.)

---

[12] *See, e.g.,*Serra Dep. at 49:10-15, 84:5-85:2, 55:2-7, 181:15-23; Marr Dep. at 71:9-14.
[13] *See* Serra Dep. at Dep. at 33:10-25, 35:17-36:2; Foster Dep. at 54:23-55:1; Russell at 69:5-11.

Although Plaintiff reported to Foster, she rarely performed clerical work for him.   (Serra

Dep. at 71:9-72:1, 72:13-19.)  Instead, Plaintiff operated independently from Foster with respect

to her primary duties—such as selecting brokers and vendors without his prior approval, and

entering into contracts in excess of $17,000 (with approval only coming *after* the services were

rendered and payments were made).  (Serra Dep. at 34:8-20, 65:7-24, 72:13-19; Foster Dep. at

55:11-15.)[14]  Because of the level of expertise she had developed over many years and the highly

complex nature of her position, with "a lot of discretion," Plaintiff herself believed that she

should be considered a "manager." (*See, e.g.,* Serra Dep. at 48:6-19, 95:2-96:6.)  In fact, Serra

held herself out as a manager when dealing with the general public and other third parties—

including, but not limited to, listing her title on her letterhead and accepting and/or rejecting

offers on behalf of Shriners.  (Serra Dep. at 138:24-139:4, 178:23-179:2, 180:21-181:23, 183:16-

184:1.)

### i.  DOL Opinion Letter Rules Similar Positions to Serra's Are Exempt

Although little authority exists addressing the exemption status of Real Estate Marketing

Closing Process Managers (or related positions), the U.S. Department of Labor ("DOL")

analyzed the very similar positions of Acquisition Agent, Relocation Agent, and Property

Management Agent for a land-acquisition service firm and determined all three positions were

exempt under the FLSA's administrative exemption.  *See* U.S. Dept. of Labor Opinion Letter,

2006 DOLWH LEXIS 30, *1 (June 29, 2006).  In its opinion letter, the DOL noted that, like

Plaintiff, many of the employees in question held real estate licenses.  *Id.*  Further, Plaintiff

performed comparable job duties to each of the analyzed positions—all of which were deemed to

---

[14] *Id.* ("A. . . . I authorized Lynn to engage vendors to sums *in excess of $17,000*.  The sign-off on the check was a *procedural matter*, but the decision to engage them, hire them and have them perform work had already been done. *The approval of the check was after the fact.*") (emphasis added).

be "related to general business operations" by the DOL.  *Id.*  By way of example only (and

similar to Plaintiff):

The Property Manager Agents:

- **Like Serra,** were responsible for "*dealing with governmental authorities, utility companies, contractors and other consultants during the conversion of the property*"  *Id.* (emphasis added);

- **Like Serra,** assisted in addressing environmental issues, such as "the presence of asbestos and to ensure compliance with environmental protection laws."  *Id.*

- **Like Serra,** "coordinate[d] and direct[ed] the demolition of the property, including *preparing detailed specifications prior to the bidding, advertising for bids, and conducting pre-bid meetings*," as well as "*us[ing] their knowledge and experience with contractors to select preferred contractors from an approved list or to shop for the best price for the work*."  *Id.* (emphasis added).  *Id.*

The Relocation Agents:

- **Like Serra,** assisted in "property appraisal," "conduct[ed] research" on properties, and "ma[d]e recommendations as to the amount of the 'replacement housing payment' to be paid to the displaced property owner."  *Id.*

The Acquisition Agents:

- **Like Serra,** were responsible for "analyzing property appraisals" and "making recommendations to the client using real estate practices, legal concepts, governmental standards, and regulations."  *Id.*

Although there are some differences between Plaintiff and these positions with respect to

the underlying *purpose* of their job duties—*e.g.,* those positions appraised property to assess the

payments made to displaced owners, while Serra appraised property to maximize profitability to

fund Shriners' operations—all of these duties are clearly "related to management or general

business operations."  29 C.F.R. § 541.201(b).  Indeed, the DOL found that such duties satisfied

the FLSA's regulations since their job duties, like Serra's job duties, were in the functional areas

of purchasing, procurement, legal and regulatory compliance, and government relations.  *See*

DOL Opinion Letter, 2006 DOLWH LEXIS 30, *1.

Quite simply, Shriners' business and medical operations are reliant on the timely and proper liquidation of willed and/or bequeathed properties.  (Serra Dep. at 19:21-20:3, 171:7-170:9, 173:2-9; Foster Dep. at 8:16-21.)  Plaintiff's job was directly related to this general business function.  (Serra Dep. at 84:5-85:2.)  As such, Plaintiff satisfies the second prong of the FLSA's administrative exemption and, like the DOL positions reviewed, is exempt.

### 3. Plaintiff's Primary Job Duty Includes the Exercise of Discretion and Independent Judgment with Respect to Matters of Significance.

In order to satisfy the third and final prong of the administrative exemption, "an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.202(a). "The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision." *Id.* § 541.202(c).  However, this implication is not an inescapable certainty; rather, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level.[15]  Thus, the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review.  "The decisions made as a result of the exercise of discretion and independent judgment may consist of *recommendations for action* rather than the actual taking of action."  *See* 29 C.F.R. § 541.202(c) (emphasis added).  Finally, "[t]here is no requirement that all or even most of Plaintiff's work involve discretion and independent judgment; the employee's work need only include use of discretion or independent judgment." *See Wilshin v. Allstate Ins. Co.*, 212 F. Supp. 2d 1360, 1378 (M.D. Ga. 2002).

---

[15] *See Jarvis*, 2009 U.S. Dist. LEXIS 86484, at *25; *see also id.* § 541.202(c).

Factors considered when determining whether the employee exercises discretion and independent judgment include, but are not limited to:

> (1) whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; (2) *whether the employee carries out major assignments in conducting the operations of the business*; (3) *whether the employee performs work that affects business operations to a substantial degree*, even if the employee's assignments are related to operation of a particular segment of the business; (4) *whether the employee has authority to commit the employer in matters that have significant financial impact*; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; (5) *whether the employee provides consultation or expert advice to management*; (6) whether the employee is involved in planning long-or short-term business objectives; (7) *whether the employee investigates and resolves matters of significance on behalf of management*; and (8) whether the employee represents the company in handling complaints, arbitration disputes or resolving grievances.

*See* 29 C.F.R. § 541.202(b) (emphasis added).  In this case, Plaintiff's primary job duty as both a Real Estate Marketing Closing Process Manager and Assistant Real Estate Marketing Manager/Closing Coordinator includes the exercise of discretion and independent judgment with respect to matters of significance.  *Id.* § 541.202(a).[16]

First, Plaintiff was responsible for carrying out major assignments in conducting the operations of the business (*i.e.,* selling properties so Shriners can operate).  *Id.* § 541.202(b).  By way of example, at the time of her departure, Plaintiff managed approximately 200 properties—including properties valued in excess of one million dollars.  (Serra Dep. at 21:8-20, 65:25-66:3, 277:23-278:10.)  **The management of these properties was not standardized, and "[e]ach property [was] different."** (*Id.* at 271:24-272:1.)  In fact, Plaintiff admits that she was told to focus on "properties that had more significant value," which required more "marketing due diligence" because they weren't straight-forward or "clear" properties.  (*Id.* at 48:24-49:12,

---

[16] *See* Serra Dep. at 129:3-17, 260:25-261:3 (acknowledging she performed the same tasks in both roles).

66:14-23; 277:23-278:10.)  There was no "written checklist" to perform her job and Plaintiff

relied on her own experience.  (*Id.* at 64:3-11.)

It is undisputed that Plaintiff had authority to select, manage, and fire vendors and

contractors—often without prior approval, but sometimes by virtue of her recommendations. *See*

29 C.F.R. § 541.202(c) ("**The fact that an employee's decision may be subject to review . . .**

**does *not* mean that the employee is not exercising discretion and independent judgment.**")

(emphasis added).   In fact, due to the complexity of her job during the last three years, Plaintiff

testified that she regularly exercised judgment and independent discretion regarding the

management of property—such as hiring vendors and contractors, determining what repairs need

to be made, and ensuring taxes are paid—*before* consulting with her supervisor.  (Serra Dep. at

95:2-96:6, 55:13.):

> Q.    So it requires a significant level of experience with real estate marketing and due
>        diligence to do your job? …
> Q:    Why?
> A.    Well, because we get these properties and you, you know, *they're not just properties
>        you can take and just contact the broker and say here we got a property, send the
>        listings. There's just so much problems.* So you have to -- whatever needs to be
>        done. There's just usually so much work, especially in the last three years. *These
>        properties had so much work to be done **before** I could even give them to Gary.*
> Q.    When you say "work," you mean you have to hire a bunch of vendors….
> A.    Vendor management, yeah, you have to hire. Made a lot of repairs. Some
>        properties they needed so many repairs before we could put it on the market, and
>        that takes a lot of time. You have to get contractors, have them go out there, and
>        you have to wait until they're done and then, you know, make sure the taxes are
>        paid, make sure the utilities are on, make sure it's clean inside, the lawn is done.

(*Id.* at 95:2-96:6; *see also* Serra Dep. at 48:6-19 ("Q.  I mean, you and [Foster] were saying [you]

ha[d] a lot of responsibility, [you] *had a lot of discretion,* [you] ha[d] a lot of – *[your] job is*

*complex and it needs to be evaluated that way.*  Right?  A. *Right.*") (emphasis added).)

Second, Plaintiff's work affected business operations to a substantial degree—most

notably by generating and/or saving Shriner's hundreds of thousands of dollars. *See* 29 C.F.R. §

541.202(b).  By way of example, Shriner's received a piece of property in San Diego, CA that was appraised at $905,000.  (Foster Dep. 91:9-92:20.)  Plaintiff worked with nine vendors to perform "selective repair and improvement" on the property.  (*Id.*)  Plaintiff solicited bids and proposal from contractors and made recommendations to Foster regarding which contractors to hire.  (*Id.*)   Several contractors were employed to redo the driveway, take down fences, address code violations, remove asbestos, and redo the exterior of the house.  (*Id.*)   As a result of this work, Shriners sold the property for $1,125,000—*i.e.,* an increase in value of **$220,000**.  (*Id.*) Although Foster signed off on the investments, **"[Plaintiff] made the decisions on what repair and improvement would most logically contribute to the resale value of the house."**  (*Id.* at 92:10-13.)  Foster testified that Shriners Hospitals would "not have hit the targeted sales price" had it "not been for [Plaintiff's] involvement with working with those vendors."  (*Id.* at 92:4-9.)

The San Diego property was not an isolated incident.  Instead, Plaintiff used her knowledge of property appraisals and taxes in order to save Shriners Hospitals significant money.  For example, in one instance, Serra dealt with governmental authorities to reduce taxes by **$60,000** to **$100,000**.  (Russell Dep. 68:3-17.)  She performed this task on her own, without Foster or Russell instructing her on how to make the reduction.  (*Id.*)   For another property, Plaintiff obtained a reduction of **$360,897** for a property's appraised value, which reduced Shriners Hospitals' tax liability by 60%.  (Serra Dep. at 134:4-135:4, Exh. 4.)  There is no dispute that Serra's supervisors (and Shriners Hospitals generally) credited this outcome to Plaintiff's work.  (*Id.* at Exh. 4.)  For example, in a contemporaneous e-mail from Foster to Russell, Foster stated: "*The result of Lynn Serra's appeal of our taxes* for this parcel is a reduction . . . from $601,495.00 to $240,598.00.   Therefore, going forward, our really high taxes

on this site should be reduced by about 60%.  *Good job, Lynn.*"  (*Id.* (emphasis added).)   Russell responded "Great work on this Lynn!"  (*Id.*)

### i.        DOL and Courts Hold Similar Duties Exempt

In other contexts, the DOL and courts have determined that similar appraisal and valuation work—including an assessment of the value of personal or real property—was sufficient to satisfy the FLSA's administrative exemption.  For instance, the FLSA's implementing regulations provide that "insurance claims adjusters" generally meet the exemption's duties requirements where their work includes "inspecting property damage," "reviewing factual information to prepare damage estimates," and "determining liability and total value of a claim."  29 C.F.R. § 541.203(a).  In keeping with the FLSA's guidance, courts have held that other positions which assess property value—such as "auto damage adjusters"—are exempt administrative employees.  *See, e.g., Robinson-Smith v. Gov't Emps. Ins. Co.*, 590 F.3d 886, 893 (D.C. Cir. 2010) (holding the "primary duty of a GEICO auto damage adjuster, which consists of the assessment, negotiation and settlement of automobile damage claims, includes the exercise of discretion and independent judgment").  Moreover, as discussed previously, the DOL has even opined that the similar positions of Acquisition Agent, Relocation Agent, and Property Management Agent perform work requiring discretion and independent judgment with respect to matters of significance—including, but not limited to, "*inspecting and determining the value of property including unique real property*" and "evaluating and *making recommendations*" regarding properties and prices. *See* DOL Opinion Letter, 2006 DOLWH LEXIS 30, *1 (emphasis added).   Although Plaintiff's work did not relate to an insurance claim or other payment, she performed the same analytical and discretionary function of appraising property value in order to carry out her job.  (*See, e.g.,* Foster Dep. 91:9-92:20.)

Third, Plaintiff regularly performed other duties involving discretion and independent judgment, such as committing Shriners Hospitals in matters that have significant financial impact. *See* 29 C.F.R. § 541.202(b).   For instance, Plaintiff was authorized to approve payments (including weekly reoccurring payments) of less than $500 to third-parties without prior approval.  (Serra Dep. at 268:1-4; Russell Dep. at 87:1-3, 88:5-89:1.)   The $500 threshold was largely "procedural" given the non-profit nature of Shriner's business (in which virtually all employees required signatures from upper management).  (Russell Dep. 87:1-23; Foster Dep. 34:6-11, 55:11-15.)  As a practical matter, Serra was authorized to enter into third-party contracts in excess of **$17,000**—with approval only being given after the third-parties were selected and completed their work.[17]  Of course, as stated previously, Plaintiff also regularly conducted research on third-parties; solicited bids; reviewed qualifications and biographies; and selected vendors, contractors, and brokers.[18]   When she engaged in these communications with third-parties, she held herself out as the manager and face of Shriners Hospitals.  (Serra Dep. at 183:16-184:1 ("Q.  Well, what I'm saying is all the communications on behalf of the organization with regard to accepting prices, accepting offers, rejecting offers, hiring vendors, all of that, all those communications are under your signature?  A.  For the properties under real estate marketing management.  Q.  Yes.  A. Pretty much.").)[19]

Courts and the DOL have held that such work, which includes committing the employer in matters that have significant financial impact, is sufficient to support the administrative exemption.  For instance, the DOL has determined that soliciting and managing bids from third

---

[17] *See* Foster Dep. at 55:11-15 ("A. . . . I authorized Lynn to engage vendors to sums *in excess of $17,000*.  The sign-off on the check was a procedural matter, but the decision to engage them, hire them and have them perform work had already been done.  *The approval of the check was after the fact.*") (emphasis added).

[18] *See* Serra Dep. at 33:10-25, 34:8-20, 35:17-36:2, 65:7-24, 144:10-14, 166:6-14; Foster Dep. 54:23-55:1, 55:16-19; Russell Dep. at 66:12-24, 69:5-11.

[19] *See also* Serra Dep. at 138:24-139:4, 178:23-179:2, 180:21-181:23.

parties requires discretion and independent judgment.  *See* DOL Opinion Letter, 2006 DOLWH LEXIS 30, *1 (finding Property Management Agents were exempt where "their work during the bid process and in the selection of contractors relates to purchasing and procurement").  Similarly, in addition to managing properties valued at over a million dollars, Plaintiff's ability to recommend Defendant enter into third-party contracts in excess of $17,000 also supports a finding that discretion and independent was utilized.  *See, e.g., Robinson-Smith*, 590 F.3d at 895 (holding adjusters performed discretionary work where they had authority to settle claims within the limits of $10,000 or $ 15,000, consistent with company guidelines or practices).

For the foregoing reasons, Plaintiff satisfies the final prong of the FLSA's administrative exemption, and she is properly classified as exempt.

### C.      **Plaintiff Was Not Employed as a Paralegal, and Did Not Perform the Non-Exempt Duties of a Paralegal.**

Based on her Complaint, Defendant anticipates that Plaintiff will contend she was misclassified because she performed work similar to a non-exempt paralegal.  (Doc. 1-1 at ¶ 10) ("Plaintiff's job duties . . . consisted primarily of legal assistant or paralegal duties in connection with real estate assets and liquidations of the organization.").  This argument is a red herring, and is only being addressed by Defendant to avoid potential confusion on this matter.

First, Plaintiff was not employed as a paralegal or certified as one as required by Defendant to be employed as a paralegal; Serra did not report to or was managed by anyone in the legal department, such as Pegler; and Serra was a member of an entirely different department with a different business function—*i.e.,* the Real Estate Marketing Division.  (*See, e.g.,* Serra Dep. at 44:7-19, 52:13-53:5, 53:3-5; Pegler Dep. at 9:12-17, 12:8-12.)  Solely by virtue of and in light of its fiduciary duty to its real estate grantors, Shriners Hospital's Board of Directors by corporate resolution requires that all contracts for the sale of real estate regardless of value—and

including, *inter alia,* brokers, listing and sales contracts—must be executed by two corporate officers of Shriners Hospitals after review by the legal department.  (Russell Dep. 13:21-23, 84:9-85:8.)   Quite simply, the legal and real estate departments were entirely distinct. (Serra Dep. at 52:13-53:5.)

Second, the Parties do not dispute that paralegals generally do not qualify for the FLSA's *professional* exemption.  *Compare* 29 C.F.R. § 541.301(e)(7).  Here, however, Plaintiff is an exempt employee by virtue of the FLSA's *administrative* exemption.  Therefore, even if Plaintiff performed some paralegal duties (which Defendant strongly disputes since it employs actual paralegals),[20] it is of no consequence that paralegals generally do not qualify for the FLSA's professional exemption.  Although employees may be exempt under multiple exemptions,[21] in order to be exempt from overtime, the employer need only show that the employee is exempt under *one* exemption.  29 U.S.C.A. § 213(a) (individuals may be exempt if "employed in a bona fide executive, administrative, *or* professional capacity") (emphasis added).  There is nothing uncommon about an employee satisfying the administrative exemption without satisfying the professional exemption (or vice versa).[22]  As discussed in length in this motion, Plaintiff's actual job duties establish that she satisfies the FLSA's administrative exemption.

## III.   CONCLUSION

In light of the foregoing authority, Shriners respectfully requests that the Court grant its Motion for Summary Judgment.

---

[20] Indeed, Pegler not only testified that he was not Serra's manager and did not direct Serra's work; but also, that the legal department had its own certified paralegal.  *See* Pegler Dep. at 7:14-22, 9:12-24.
[21] *See, e.g., Bagwell v. Fla. Broadband, Ltd. Liab. Co.*, 385 F. Supp. 2d 1316, 1329 (S.D. Fla. 2005) (holding the plaintiff was exemption under both the FLSA's administrative and computer professional exemption).
[22] *See, e.g., Crowe v. ExamWorks, Inc.*, 136 F. Supp. 3d 16, 36, 69 (D. Mass. 2015) (holding Clinical Quality Assurance Coordinators were exempt from overtime under the administrative exemption, but not the professional exemption); *Pippins v. KPMG LLP*, 921 F. Supp. 2d 26, 28-29 (S.D.N.Y. 2012) ("I conclude that Audit Associates are exempt as 'learned professionals,' and so need not be paid overtime. . . . [therefore,] [i]t is not necessary to discuss the applicability of the administrative exemption.").

Respectfully submitted,

By  */s/ Tracey K. Jaensch*
    Tracey K. Jaensch, B.C.S.
    Florida Bar No. 907057
    David M. Kalteux
    Florida Bar No. 118746

    FORD & HARRISON LLP
    101 E. Kennedy Boulevard
    Suite 900
    Tampa, FL  33602-5133
    Phone: 813-261-7800
    Fax: 813-261-7899
    tjaensch@fordharrison.com
    dkalteux@fordharrison.com

    *Attorneys for Shriners Hospitals For Children, Inc.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on February 25, 2018, I hereby electronically filed the foregoing with the Clerk of Court by using CM/ECF system, which will send a notice of electronic filing to the following:

Wolfgang M. Florin
Christopher D. Gray
Florin, Gray, Bouzas, Owens, LLC
16524 Pointe Village Drive, Suite 100
Lutz, FL  33558
wolgang@fgbolaw.com
chris@fgbolaw.com

    /s/ Tracey K. Jaensch
    Attorney